Walters Bender STROBEHN &
Vaughan, P.C., Respondent,

v.

Elizabeth MASON, Appellant.

No. WD 75140.

Missouri Court of Appeals,
Western District.

Feb. 26, 2013.

Motion for Rehearing and/or Transfer
to Supreme Court Denied March
26, 2013.

Application for Transfer Denied
May 28, 2013.

See also 67 A.D.3d 475, 889 N.Y.S.2d 24.

Stephen B. Millin, Jr., Kansas City, MO, for respondent.

Elizabeth Mason, New York City, and Erich V. Vieth, St. Louis, MO for appellant.

Before Division One:  MARK D. PFEIFFER, P.J., and VICTOR C. HOWARD and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

In 2007, Respondent Walters Bender Strohbehn & Vaughan, P.C., a Kansas City-based law firm, entered into an agreement with Appellant Elizabeth Mason, a New York attorney, to serve as co-counsel with Mason in a personal-injury case pending in the New York state courts. Mason terminated the arrangement after a mistrial was declared in the New York litigation. She enlisted the assistance of other co-counsel, and ultimately settled the case for a substantial sum before the jury returned a verdict at a second trial.  Walters Bender asserted an attorneys-fee lien on the settlement proceeds in New York, and also filed this civil action in the Circuit Court of Jackson County, seeking to impose personal liability on Mason for its claimed fee. Mason petitioned the New York court to declare Walters Bender's lien void, and Walters Bender cross-petitioned to enforce the lien.  Following a trial, the New York court entered a judgment determining that Walters Bender was entitled to a fee of $109,425.39.  The circuit court adopted the findings of the New York court that the co-counsel agreement had not been terminated for cause, and concerning the amount of Walters Bender's fee, and entered a personal judgment against Mason for $109,425.39, plus pre-judgment interest of $39,141.35.  Mason appeals, claiming that the circuit court lacked both personal and subject-matter jurisdiction.  We affirm.

### Factual Background

Mason is a New York litigation attorney. In the fall of 2007, Mason was preparing to try a civil case captioned *Anonymous v. High School for Environmental Studies, et al.,* No. 03/115352 (Sup.Ct., N.Y.Cnty.).

The case, which had been pending since 2001, arose out of the rape of a minor female high-school student by one of her teachers. The trial was expected to address only damages issues, since the trial court had stricken the City of New York's answer due to discovery violations. A jury trial was set for November 26, 2007.

In preparing for trial, Mason retained Dr. David Corwin to serve as an expert forensic child psychiatrist on October 3, 2007. Dr. Corwin gave Mason contact information for Michael D. Strohbehn, a shareholder of Walters Bender. The parties dispute why Mason was given Strohbehn's name. Mason claims that Strohbehn was merely a reference for Dr. Corwin. Strohbehn claims, on the other hand, that he had previously given Dr. Corwin permission to pass his information along to Mason as a potential resource. Regardless, on October 18, 2007 (more than two weeks *after* retaining Dr. Corwin), Mason contacted Strohbehn and they discussed *Anonymous*. Mason claims that, during this conversation, Strohbehn expressed an interest in the case because it shared similarities with a case he had previously handled, which resulted in a substantial verdict. Mason also alleged that Strohbehn offered to fly to New York at his own cost simply to discuss the case further. For his part, Strohbehn testified that during the October 18 conversation he expressed concerns to Mason that her damages claim was not more fully developed, and that Mason asked him if he would consider becoming involved in the case. In response, Strohbehn flew to New York to discuss the case further, to determine if he would serve as her co-counsel.

Strohbehn met with Mason in New York on October 22. Though the parties' accounts differ as to the specific course of events, both parties agree that while Strohbehn was in New York, Mason offered him one-third of her contingency fee to assist with the case. On October 23, Strohbehn returned to Mason's office and met with the client. Mason testified that, at that time, Strohbehn accepted her offer to serve as co-counsel. Strohbehn testified that he told Mason that he could not accept the offer without consulting his fellow shareholders. Strohbehn testified that he returned to Kansas City, without having committed to participate in the case, to discuss the opportunity with his colleagues. Strohbehn testified that, after doing so, he accepted Mason's offer during a telephone call she initiated on October 24. No written contract was ever signed.

Strohbehn and his staff worked from Kansas City on various tasks related to trial preparation, including analyzing medical records and creating a chronology, contacting and hiring additional experts, and preparing for witness examinations and closing arguments. Meanwhile, Mason continued to work on the case from New York, and was frequently in contact with Strohbehn as their trial preparations continued.

The trial began on November 26, 2007. Both Mason and Strohbehn participated in the trial; among other things, Strohbehn conducted voir dire, gave the opening statement, and conducted witness examinations. After four trial days, a mistrial was declared on December 5, 2007.

Mason contended that Strohbehn committed acts of misconduct during the trial (allegations which Strohbehn denied). After the mistrial, Mason terminated the co-counsel agreement, and instead hired another New York attorney to assist her in the second trial, at the same compensation (one-third of Mason's fee). During the second trial, the case was settled for $1,100,000 before the jury reached a verdict.

On February 27, 2008, an attorney representing Walters Bender[1] notified counsel for the City of New York that Walters Bender asserted a lien against any recoveries in *Anonymous* under New York Judiciary Law § 475 and § 484.130, RSMo. On March 3, 2008, Walters Bender also filed the present suit against Mason personally, alleging claims for breach of contract, conversion, unjust enrichment, and quantum meruit.

After being informed of Walters Bender's assertion of an attorneys-fee lien, the City refused to disburse the settlement proceeds. On May 14, 2008, Mason filed a petition in the *Anonymous* case, seeking a court order requiring the City to disburse the settlement proceeds to the client and to her, and to find Walters Bender's lien to be unenforceable. Walters Bender cross-petitioned to enforce the lien. In June 2008, the New York trial court awarded Walters Bender a judgment of $5,250, representing $3,250 for ten hours of attorney services, and $2,000 in expenses. Walters Bender appealed. On November 10, 2009, the New York Supreme Court, Appellate Division, reversed, and "remanded for a hearing to determine whether [Strohbehn] is entitled to be paid for his services, and, if so, the reasonable value of his services and the amount of any reasonable expenses." *Mason v. City of N.Y.*, 67 A.D.3d 475, 889 N.Y.S.2d 24, 25 (2009).

After conducting a trial concerning whether Strohbehn had been discharged for cause, the reasonable value of his services, and the amount of his reasonable expenses, the New York trial court entered a new decision on January 27, 2012. The trial court found:

It is without a doubt that Mr. Strohbehn had fallen out of favor with [the client], and she was entirely within her rights to discharge Mr. Strohbehn with or without cause.... However, on the evidence before me, I cannot hold as a matter of law, that the discharge here was for cause, rather than disenchantment.

The New York court also found that, "[o]n the issue of *quantum meruit*, [Strohbehn] may not be entitled to the entire fee that he anticipated, but I find that 2/3 of that fee or $109,425.39, is the proper fee in this instance." Mason asserts that she is currently appealing the New York court's January 2012 decision.

While the proceedings were ongoing in New York, the circuit court granted Mason's motion to dismiss the Missouri action on June 18, 2009, on the ground that the Missouri action was precluded by *res judicata* based on the New York court's original judgment concerning the attorneys lien. This Court reversed, holding that Mason's motion to dismiss was converted into a motion for summary judgment due to her reliance on documents beyond the petition, and that Walters Bender had not been given adequate notice that the court intended to consider the motion as one for summary judgment. *Walters Bender Strohbehn & Vaughan, P.C. v. Mason*, 316 S.W.3d 475, 479–81 (Mo.App. W.D.2010). We remanded the case to the circuit court for further proceedings. *Id.* at 481.

On January 30 and February 1, 2012, the circuit court held a jury trial limited to a single question: where Strohbehn accepted Mason's offer to serve as co-counsel in the *Anonymous* case. The application of Missouri's "long-arm" statute, governing

1. The issues Mason raises on appeal do not require us to distinguish between Strohbehn and the law firm in which he is a shareholder, and we therefore refer to Strohbehn and Wal- ters Bender interchangeably in the remainder of this opinion. Walters Bender was the sole named plaintiff in the circuit court, and is the sole respondent in this appeal.

service of process on an out-of-state defendant, depended on the answer to this question. The jury found that the contract had been entered in Missouri.

The circuit court conducted a further evidentiary hearing on February 6, 2012, to address whether Mason's contacts with the State of Missouri justified the exercise of personal jurisdiction over her. On February 21, 2012, the circuit court entered a Judgment containing detailed findings of fact. The court found Strohbehn's testimony "to be credible and consistent, even at times offering testimony that arguably might not be fully supportive of the position he was advocating." The court found Mason not to be a credible witness, noting that during her testimony she "was often evasive and non-responsive," and "offered different explanations of events, [and] provided different versions of events," during her testimony as compared to affidavits she had previously filed.

Based on its assessment of the witnesses' credibility, the court found that Mason's initial call to Strohbehn on October 18, 2007, "was for the specific purpose of retaining the services of [Walters Bender], which was located in Missouri and which presumably would be performing significant work in Missouri." The court noted that Mason solicited Strohbehn's involvement in the case because she "did not have the necessary support staff, including paralegals and nurse consultants, to prepare for the trial," and "was aware [Walters Bender] had this support staff and that the work would be performed in Missouri." The court also found that Mason called Strohbehn in Kansas City on October 24, 2007, after his visit to New York, "for the purpose of determining if [Walters Bender] would agree to act as trial counsel and ... also for the purpose of retaining [Walters Bender] to act as trial counsel.

Mr. Strohbehn accepted Ms. Mason's offer during this telephone call."

The judgment states that, "[o]ther than their work performed in New York during the weekend before the trial and during the trial, the overwhelming majority of [Walters Bender]'s work was performed in [Walters Bender]'s office in Kansas City, Missouri. Additionally, during the trial in New York, employees of [Walters Bender], located in Missouri, continued to work on the case." The court noted that "virtually all of the records, work product and documentary evidence produced as a result of the agreement between [Walters Bender] and [Mason] were created and produced in Missouri."

The court's judgment finds that "Ms. Mason was regularly in contact with [Walters Bender] regarding preparation for the upcoming trial," was aware of the work they were performing in Kansas City, provided information and material to Walters Bender for their use in preparing for trial, and "volunteered to travel to Missouri and work together with [Walters Bender] in [Walters Bender]'s office."

Based on these factual findings, the circuit court found that Mason was subject to the court's personal jurisdiction.

The circuit court had earlier determined that the New York court's January 27, 2012 decision collaterally estopped the parties from relitigating the reasonable value of Strohbehn's services, or whether Strohbehn had been discharged for misconduct. Other than objections to personal jurisdiction, and arguments based on the preclusive effect of the New York proceedings and judgment, Mason asserted no defenses to Walters Bender's personal-liability claim. Accordingly, based on its finding that personal jurisdiction existed over Mason, and the findings of the New York court, the circuit court entered a personal judgment against Mason for $109,425.39,

plus prejudgment interest from the date of the filing of the Missouri petition, totaling $39,141.35.

Mason appeals.

## Discussion

Mason makes two arguments on appeal. First, she argues that the trial court lacked subject-matter jurisdiction over the action due to the prior proceedings and judgment entered in the New York litigation, under principles of *res judicata,* collateral estoppel, claim-splitting, and Full Faith and Credit. Second, she claims that the trial court lacked personal jurisdiction over Mason. Mason does not challenge the trial court's findings of fact. Instead, her appeal raises purely legal issues, which we review *de novo.*

## I.

■ At the outset, we emphasize that Mason's arguments concerning the preclusive effect of the New York litigation and judgment do not present issues of subject-matter jurisdiction. As the Missouri Supreme Court made clear in *J.C. W. ex rel. Webb v. Wyciskalla,* 275 S.W.3d 249 (Mo. banc 2009), "Article V, section 14 [of the Missouri Constitution] sets forth the subject matter jurisdiction of Missouri's circuit courts in plenary terms, providing that '[t]he circuit courts shall have original jurisdiction over *all* cases and matters, civil and criminal.' " *Id.* at 254. This civil case plainly falls within the Missouri Constitution's jurisdictional grant. *Id.* ("The present case is a civil case. Therefore, the circuit court has subject matter jurisdiction . . . ."). As we explained in the earlier appeal of this case, the "subject-matter jurisdiction" arguments Mason raises in

fact assert affirmative defenses, not jurisdictional objections. *Walters Bender,* 316 S.W.3d at 479 (" 'While not expressly stated in [Rule 55.27(a) ], defenses of res judicata and issue preclusion are in essence defenses alleging the plaintiff has failed to state a claim upon which relief may be granted.' ") (quoting *King Gen. Contractors, Inc. v. Reorganized Church of Jesus Christ of Latter Day Saints,* 821 S.W.2d 495, 498 (Mo. banc 1991)); *see also* Rule 55.08 (listing "res judicata" among affirmative defenses which must be set forth in responsive pleading).[2]

■ Generally, the preclusive effect of a judgment is determined by the law of the jurisdiction in which the judgment was rendered. RESTATEMENT (2D) OF CONFLICT OF LAWS § 95 (1971) ("What issues are determined by a valid judgment is determined, subject to constitutional limitations, by the local law of the State where the judgment was rendered."); *Andes v. Paden, Welch, Martin & Albano, P.C.,* 897 S.W.2d 19, 22 (Mo.App. W.D.1995) ("to determine the scope of *res judicata* in a particular jurisdiction, 'it is essential to consult the relevant statutes and rules of court in that jurisdiction' "). Because the judgment on which Mason relies was issued by a New York state court, New York law governs the preclusive effect of that judgment on later proceedings in Missouri.

■ Under New York law, an earlier action in which limited remedies are available does not bar a later action seeking additional remedies, which were not available in the earlier action. "[R]es judicata is inapplicable where the plaintiff 'was unable to . . . seek a certain remedy or form

---

**2.** Although Mason's preclusion arguments may not present jurisdictional issues, Walters Bender concedes that she raised her arguments concerning the preclusive effect of the New York litigation and judgment throughout the proceedings in the circuit court, and adequately preserved the issues for appellate review.

of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain ... multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action ... to seek that remedy or form of relief.'" *Parker v. Blauvelt Volunteer Fire Co.*, 93 N.Y.2d 343, 690 N.Y.S.2d 478, 712 N.E.2d 647, 650 (1999) (quoting Restatement (2d) of Judgments § 26(1)(c) (1982)); *see also, e.g., Ross Realty v. V & A Fabricators, Inc.* 42 A.D.3d 246, 836 N.Y.S.2d 242, 247 (2007).

■ New York courts have applied this principle in the precise situation presented here: where an attorney first asserted a lien under New York Judiciary Law § 475 in the underlying action, but later sought to impose personal liability on the client, or another attorney, for the attorney's fees. The New York decisions emphasize that "the expedited procedure of Judiciary Law § 475 is designed to attach only the specific proceeds of the judgment or settlement in the action where the attorney appeared." *Haser v. Haser*, 271 A.D.2d 253, 707 N.Y.S.2d 47, 50 (2000). Because a § 475 proceeding is an *in rem* proceeding limited to determining the rights of the parties in the proceeds of a judgment or settlement, "the court in a section 475 proceeding is without authority to direct entry of a *personal* judgment against the client." *Matter of Regan v. Marco M. Frisone, Inc.*, 54 A.D.2d 1125, 388 N.Y.S.2d 798, 800 (1976). To obtain a judgment imposing personal liability, an attorney seeking fees must file a separate, "plenary" action. *Haser*, 707 N.Y.S.2d at 50.

■ Given the different remedies available under Judiciary Law § 475 and in a plenary action, the New York courts have emphasized that "[t]he three remedies of an attorney discharged without cause—the

retaining lien, the charging lien, and the plenary action in quantum meruit—are not exclusive but cumulative." *Levy v. Laing*, 43 A.D.3d 713, 843 N.Y.S.2d 542, 544 (2007) (citing *Butler, Fitzgerald & Potter v. Gelmin*, 235 A.D.2d 218, 651 N.Y.S.2d 525 (1997)). Because the measure of recovery in a plenary action and a § 475 proceeding are the same, however, "once the value of attorney's services is determined in a proceeding to fix his lien, it will be conclusive upon the parties in any other subsequent proceeding or action." *Roulstone v. Oesterreicher*, 188 Misc. 741, 66 N.Y.S.2d 244, 244 (Sup.Ct.1946); *accord, Botein, Hays, Sklar & Herzberg v. Polymetrics Int'l, Inc.*, 81 Misc.2d 398, 366 N.Y.S.2d 251, 255 (Civ.Ct.1975).

■ The Appellate Division of the New York Supreme Court addressed a situation virtually identical to this case in *Butler, Fitzgerald & Potter v. Gelmin*, 235 A.D.2d 218, 651 N.Y.S.2d 525 (1997). In that case, as here, a discharged law firm prosecuted a special proceeding under Judiciary Law § 475 to determine the amount of its charging lien; the court in the § 475 proceeding determined the reasonable value of the discharged attorney's services. *Id.* at 526. The discharged attorney then commenced a separate plenary action to impose personal liability for its fees on its former client. The trial court dismissed the plenary action on the basis that the discharged attorney "'seeks the same relief in this motion that it has already received'" in the § 475 proceeding in the underlying action. *Id.* at 527. The Appellate Division reversed. It explained:

> There are three separate and distinct remedies which are available to a discharged attorney to recover the value of his legal services. The first remedy available to an attorney discharged without cause is that sought by the plaintiff in this case, i.e., a plenary action in

quantum meruit seeking a judgment for the reasonable value of the services, which would be enforceable against all of the client's assets. . . . The second remedy available is a charging lien against any judgment or settlement in favor of the client in an action in which the discharged attorney formerly was the attorney of record for the client. Unlike the first remedy, the charging lien does not provide for an immediately enforceable judgment against all assets of the former client. All it provides to the discharged attorney is security against a single asset of the client, i.e., any judgment or settlement reached in favor of the former client in the action in which the discharged attorney was formerly attorney of record. . The charging lien is a statutory remedy codified in Judiciary Law § 475. . . . The third remedy is the retaining lien, which permits the attorney to retain all of the client's papers and files until all fees are paid.

After plaintiff was discharged in the [underlying] Federal action, it obtained two of the three remedies available to it by petitioning the court to set and determine the amount of its charging and retaining liens. However, by doing so, it was not precluded from obtaining the third remedy of a plenary action for the fair and reasonable amount of monies due to it for its services. The remedies are not exclusive but cumulative. An attorney need not elect one remedy to the exclusion of the others and does not waive her right to commence an immediate plenary action for a judgment against her client by commencing a proceeding to fix the amount of her charging lien.

The relief plaintiff seeks in this action, therefore, is not the same obtained in the lien proceedings in the Federal court. . . . [A]lthough the value of the services has already been fixed in the Federal action, the [trial] court erroneously found that plaintiff sought the same relief herein that it had already obtained in the Federal action.

*Id.* at 527 (citations omitted). Numerous other New York cases are in accord: the fact that an attorney has previously prosecuted an action under § 475 does not prevent the attorney from later pursuing a plenary action to impose personal liability.[3]

**3.** See, e.g., *Balestriere PLLC v. BanxCorp*, 96 A.D.3d 497, 947 N.Y.S.2d 7, 8–9 (2012); *Anonymous v. Anonymous*, 258 A.D.2d 279, 685 N.Y.S.2d 67, 67 (1999) (attorney's "commencement of a plenary action to recover his fee did not constitute an election of remedies precluding him from pursuing his rights under Judiciary Law § 475 in the main action"); *Bonnaig v. Nunez*, No. 12 Civ. 1853 (HB), 2012 WL 6200977, at *3 (S.D.N.Y. Dec. 11, 2012) ("the state court's denial of Plaintiff's motion for a charging lien [after attorney withdrew from action] has no bearing on Plaintiff's action in *quantum meruit* before this Court"); *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, No. 95 Civ. 2144 (JGK), 1999 WL 58680, at *14 (S.D.N.Y. Feb. 4, 1999) ("moving to have a charging lien fixed under § 475 in federal court and proceeding with a state court action against Lowenfeld and the plaintiffs are not mutually inconsistent actions. Trope is entitled to pursue both remedies for his unpaid attorney's fees.").

We recognize that *Rowley, Forrest, O'Donnell & Beaumont, P.C. v. Beechnut Nutrition Corp.*, 55 A.D.3d 982, 865 N.Y.S.2d 390 (2008), holds that an attorney was barred by *res judicata* from prosecuting a § 475 proceeding in an independent action, after unsuccessfully litigating a plenary action seeking a *quantum meruit* recovery, on the theory that "plaintiff could have sought a charging lien in the [earlier plenary] action." *Id.* at 392. The present case involves the opposite situation, however—here, the first action pursued to final judgment was a § 475 proceeding in the underlying tort case, a limited, special proceeding in which claims for personal liability cannot be joined.

It may also be the case that Strohbehn was not entitled to use the § 475 lien proceeding

Mason argues that the caselaw discussed above is inapplicable here, because in the New York case Walters Bender sought not only to "fix" and "determine" the amount of its charging lien, but also sought to "enforce" that lien. We question whether that distinction would alter the applicability of the principles described above (except, of course, to the extent that Walters Bender had recovered all or part of its fee through such lien-enforcement efforts). But even if the New York courts would treat a proceeding to "enforce" a § 475 lien differently from a proceeding which merely sought to "fix" or "determine" one, under New York law an attorney "must obtain enforcement of his lien by appropriate order of the court in which the action is pending. Such an enforcement order may direct that the lien be satisfied out of money or property to which the lien attaches even though it is not in the possession or control of the attorney." *People v. Keeffe*, 50 N.Y.2d 149, 428 N.Y.S.2d 446, 405 N.E.2d 1012, 1015 (1980) (citation omitted); *see also Matter of Regan v. Marco M. Frisone, Inc.*, 54 A.D.2d 1125, 388 N.Y.S.2d 798, 800 (1976). No such order, directing satisfaction of Walters Bender's lien from particular funds or property, was entered in this case. The Appellate Division determined that the charging lien could not be enforced against the City of New York because the City had already disbursed the settlement proceeds in reliance on the trial court's initial order determining Walters Bender's fee, *see* 889 N.Y.S.2d at 25–26, and on remand from that decision, the trial court merely determined the amount of Walters Benders' recoverable fee and expenses, without making any order as to how that outstanding obligation could or would be satisfied.

Mason notes that the New York court's January 2012 decision, to which the trial court gave collateral estoppel effect, is currently being appealed. Even if that were accurate, under New York law the pendency of an appeal would not alter the preclusive effect of the trial court's decision. *See, e.g., Plaza PH2001 LLC v. Plaza Residential Owner LP*, 98 A.D.3d 89, 947 N.Y.S.2d 498, 505 (2012) ("the pending appeal did not alter the applicability of the doctrine of res judicata at that time"); *Franklin Dev. Co. v. Atl. Mut. Ins. Co.*, 60 A.D.3d 897, 876 N.Y.S.2d 103, 105 (2009) ("'The rule in New York is that the "pendency of an appeal does not prevent the use of" the challenged judgment as the basis of collateral estoppel'") (quoting *Anonymous v. Dobbs Ferry Union Free Sch. Dist.*, 19 A.D.3d 522, 797 N.Y.S.2d 120, 121 (2005) (other citation omitted)).[4]

to determine the liability *of his co-counsel,* Mason, for his fees; instead, it may be that such proceedings may only determine the fee owed *by the client. Itar–Tass*, 1999 WL 58680, at *15 ("A charging lien may be used to enforce obligations that a former client has to a lawyer based on the lawyer's agreement to represent the client. A charging lien is not available under the terms of the statute to enforce a contract between two lawyers simply because the amount one attorney will owe the other under their contract will ultimately depend on how much money their common former client collects."). If Walters Bender could not assert a claim *against Mason* in the § 475 proceeding, this would provide a further basis for refusing to find that the New York litigation precluded Walters Benders from prosecuting this action. Given our disposition, however, we need not further address this issue.

4. Mason cites *Wright v. Bartimus Frickleton Robertson & Gorny P.C.*, 364 S.W.3d 558 (Mo. App. W.D.2011), and *Reed v. Garner Indus., Inc.*, 832 S.W.2d 945, 947 (Mo.App. E.D. 1992), to argue that entry of the New York judgment prevented Walters Bender from proceeding in this action. Both *Wright* and *Reed* involve Missouri law, however, and thus neither is relevant in determining the preclusive effect of a New York judgment. In addition, those cases only discuss the alternative remedies available to an attorney *to enforce*

Walters Bender proceeded in a manner sanctioned by New York law. It first asserted a lien under Judiciary Law § 475, and then sought to impose personal liability on Mason for its fees and expenses in this independent action. The two remedies are cumulative, not exclusive, and may properly coexist. Further, consistent with New York law, once the amount of Walters Bender's reasonable fees and expenses was determined in the § 475 proceeding, that determination was given preclusive effect in the Missouri action.[5]

All of Mason's arguments under her first Point—whether invoking doctrines of *res judicata,* collateral estoppel, claim-splitting, or constitutional principles of Full Faith and Credit—depend on a determination that this action is somehow inconsistent with, or constitutes a collateral attack on, the New York judgment. Because we have determined that the prosecution of this action to a final judgment is fully consistent with New York law, we reject Mason's arguments without further discussion.

## II.

■ Mason argues in her second Point that the trial court lacked personal jurisdiction over her, because she did not have sufficient contacts with Missouri to satisfy due process requirements.

Missouri courts employ a two-step analysis to evaluate personal jurisdiction. First, the court inquires whether the defendant's conduct satisfies Missouri's long-arm statute, section 506.500[,

RSMo]. If so, the court next evaluates whether the defendant has sufficient minimum contacts with Missouri such that asserting personal jurisdiction over the defendant comports with due process.

*Bryant v. Smith Interior Design Grp., Inc.,* 310 S.W.3d 227, 231 (Mo. banc 2010) (citing *Conway v. Royalite Plastics, Ltd.,* 12 S.W.3d 314, 318 (Mo. banc 2000)).

The long-arm statute, § 506.500, provides in relevant part:

1. Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any such acts:

. . . .

(2) The making of any contract within this state. . . .

■ For purposes of the long-arm statute, a contract is made where acceptance occurs. *Wilson Tool & Die, Inc. v. TBDN–Tenn. Co.,* 237 S.W.3d 611; 615 (Mo.App. E.D.2007) (citing *Johnson Heater Corp. v. Deppe,* 86 S.W.3d 114, 119 (Mo.App. E.D.2002)). Here, a jury determined after trial that Walters Bender accepted Mason's offer of a co-counsel agreement in Missouri, during a phone call Mason initiated with Strohbehn. *See Poor*

*an attorney's lien* (either a motion in the underlying case, or commencement of an independent action). Neither involves the issue here (the relationship between an *in rem* lien-enforcement action, and an *in personam* action against a defendant who is personally liable for an attorney's fees).

5. At various points in her brief, Mason notes that the circuit court awarded Walters Bender prejudgment interest, in addition to awarding the attorney's fees and expenses determined by the New York court. She fails, however, to develop any legal argument that the award of prejudgment interest, specifically, is inconsistent with the New York judgment, and we accordingly do not address the issue.

*Boy Tree Serv., Inc. v. Dixie Elec. Membership Corp.,* No. SD31805, 2013 WL 432904, at *1 (Mo.App. S.D. Feb. 4, 2013) ("a contract is made in the state where the acceptor speaks into the phone"). Mason does not challenge that finding on appeal. Accordingly, the exercise of jurisdiction over Mason was consistent with Missouri's long-arm statute.

▓▓▓▓ Turning to the second step of the personal-jurisdiction analysis, the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that a defendant's contacts with the forum be sufficiently extensive so that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation and internal quotation marks omitted). "When evaluating minimum contacts, the focus is on whether 'there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Bryant,* 310 S.W.3d at 232 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). "In determining whether a defendant has established sufficient minimum contacts, "'the foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'"" *Peoples Bank v. Frazee,* 318 S.W.3d 121, 129 (Mo. banc 2010) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (in turn quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980))).

▓▓▓▓ A court may either have "general jurisdiction" (where a defendant's contacts with the forum State "are systematic, continuous and substantial enough to furnish personal jurisdiction ... on any cause of action"), or "specific jurisdiction" (when the suit arises out of or relates to the defendant's contacts with the forum). *Bryant,* 310 S.W.3d at 232. "In some cases, single or isolated acts by a defendant in a state, because of their nature and quality and the circumstances of their commission, provide sufficient minimum contacts to support jurisdiction for liability arising from those acts." *Id.* at 233.

▓▓▓▓ As Mason notes, the fact that she entered into a contract with a Missouri resident does not, by itself, support the exercise of personal jurisdiction over her.

"[A]n individual's contract with an out-of-state party alone" cannot "automatically establish sufficiently minimum contacts in the other party's home forum." Instead, whether an execution of a contract with an out-of-state party can constitute a sufficient contact for due process analysis is a multifaceted, fact-specific inquiry, and never a mechanical application of rules. Prior negotiations and "contemplated future consequences," as well as the terms of the contract and the parties' course of dealings, are all factors that must be evaluated in determining "whether the defendant purposefully established minimum contacts within the forum."

*Peoples Bank,* 318 S.W.3d at 129–30 (quoting *Burger King,* 471 U.S. at 478, 479, 105 S.Ct. 2174).

Although the existence of a contractual relationship with a Missouri defendant may not be enough to support personal jurisdiction in isolation, prior Missouri cases have held that personal jurisdiction exists where a defendant solicits a Missouri resident to enter into a contractual relationship, the contract contemplates the

performance of substantial services in Missouri, and the defendant maintains substantial contact with the Missouri resident during the contract's performance. In *State ex rel. Metal Service Center of Georgia, Inc. v. Gaertner,* 677 S.W.2d 325 (Mo. banc 1984), the Missouri Supreme Court held that a Georgia corporation (Metal Service) was subject to suit in Missouri, where it initiated contact with a Missouri corporation (Roton Products), to engage Roton Products to work on Metal Service's finished metal products. *Id.* at 326. Metal Service paid to have unfinished materials shipped to Roton in Missouri, and then paid to have the materials shipped back to Metal Service following Roton's work. *Id.* Metal Service refused to pay Roton for certain of the work it performed, and Roton then sued it for breach of contract in the Circuit Court of the City of St. Louis. *Id.* The Supreme Court held that in these circumstances, in which the contract "called for performance wholly within Missouri on materials shipped into the state by" Metal Service, the Due Process requirements for exercise of personal jurisdiction were satisfied, even though the contract was made in Georgia. *Id.* at 327, 328. The Eastern District reached the same result on very similar facts in *Wilson Tool & Die, Inc. v. TBDN–Tenn. Co.,* 237 S.W.3d 611, 616–17 (Mo.App. E.D.2007). This Court also held that personal jurisdiction could lawfully be exercised over an out-of-state defendant in *Tempmaster Corp. v. Elmsford Sheet Metal Works, Inc.,* 800 S.W.2d 45 (Mo.App. W.D.1990), even though in *Tempmaster* it appears that all of the pre-contractual negotiations occurred in New York, *id.* at 46, and there

is no indication that the out-of-state defendant shipped any products or materials into Missouri to facilitate the plaintiff's work. To support jurisdiction, the Court simply noted that the out-of-state defendant "entered into a contract with appellant which called for the manufacture of over one million dollars worth of equipment in the state of Missouri to be used in New York." *Id.* at 47.

While these cases involve the manufacture of products, the principles they illustrate are also applicable to contracts for the performance of professional services. For example, *Tempmaster* (800 S.W.2d at 48) cited and followed the federal court's decision in *Commercial Design, Inc. v. Dean/Dale & Dean Architects,* 584 F.Supp. 890 (E.D.Mo.1984). In *Commercial Design,* "[t]hrough either telephone calls or letters from [a Mississippi] defendant to [a Missouri] plaintiff, defendant solicited a contract offer or proposal from plaintiff to perform certain design services for a bank that was being built by defendant in Mississippi." *Id.* at 892. Although the contract involved professional services relating to a building being built in Mississippi, by a Mississippi defendant, the court held that it was appropriate to exercise personal jurisdiction over the defendant in Missouri: "Defendant made a contract in Missouri and caused that contract to be performed in Missouri. Under these circumstances it is entirely fair to require defendant to defend a lawsuit in Missouri arising out of the alleged breach of said contract." *Id.* at 893.[6]

■ Although we are not aware of any Missouri addressing the precise factual cir-

---

**6.** *See also St. Jude Med., Inc. v. Lifecare Int'l, Inc.,* 250 F.3d 587, 592 (8th Cir.2001) (finding sufficient minimum contacts with Minnesota where the defendant "initiated contact with St. Jude and communicated by phone and letter to St. Jude in Minnesota to obtain the agreement," and "[t]he parties contract

contemplated an ongoing relationship requiring regular communications between Lifecare in California and St. Jude in Minnesota"); *Gangwere v. Bischoff,* 935 S.W.2d 783, 786 (Mo.App. W.D.1996) (although out-of-state defendant never entered Missouri, finding minimum contacts for purposes of breach of con-

cumstances of this case, decisions in other jurisdictions have held that the minimum contacts test is satisfied where an out-of-state defendant solicits the services of a forum-state attorney, even if (as here), the out-of-state defendant never physically enters the forum state as part of the arrangement.[7] The courts have exercised personal jurisdiction over an out-of-state defendant who retained a local attorney, even where the attorney was retained to work on litigation in another state.[8] These cases necessarily recognize that, even where a case is pending in another jurisdiction, a substantial portion of a lawyer's services are performed in the lawyer's offices, not in the courtroom, including such tasks as legal research and writing, review of relevant documents, witness prepara-

tion, and the preparation of opening statements, closing arguments, and anticipated witness examinations.

Under these decisions, the trial court properly found personal jurisdiction to exist in this case. The trial court found, after considering the testimony and evidence presented to it, that Mason initiated contact with Strohbehn in Missouri for the specific purpose of "seeking trial counsel and/or requesting him to act as trial counsel." The trial court also found that Mason was aware, when she solicited Walters Bender's assistance, that Strohbehn and other professionals would be required to perform substantial services in Missouri.[9] Mason later called Strohbehn in Missouri, following his visit to New York City, to

---

tract action where defendant engaged in "persistent [telephone] solicitation of the plaintiff" to make an investment, plaintiff accepted the offer and the contract was accordingly made in Missouri, and the defendant thereafter maintained "regular phone and mail contact with the state").

7. See, e.g., Remick v. Manfredy, 238 F.3d 248, 256–57 (3d Cir.2001) (finding personal jurisdiction in Pennsylvania over out-of-state client on breach of contract claim where: client solicited services of Pennsylvania-based attorney; attorney executed fee agreement in Pennsylvania; at least one payment was made to Pennsylvania; "[m]ost of the services" were performed in Pennsylvania; and "there were repeated 'informational communications' during the course of the contractual relationship between [client] and [attorney] with [attorney] at his Philadelphia office").

8. English & Smith v. Metzger, 901 F.2d 36, 39 (4th Cir.1990) (Virginia attorney retained to work on criminal and civil-forfeiture cases pending in California; "Metzger initiated the relationship with Smith, knowing that Smith was a Virginia lawyer who likely would do the requested work in Virginia. Metzger contracted with Smith in Virginia, first by telephone and later in a writing that Smith, as the last party to sign, executed in Virginia. Smith performed all of his duties under the contract in Virginia. Finally, the parties ex-

changed numerous telephone calls and written communications." (footnote omitted)); Paul, Hastings, Janofsky & Walker, LLP v. City of Tulsa, 245 F.Supp.2d 1248, 1255–58 (N.D.Ga.2002) (finding personal jurisdiction over Oklahoma municipality in Georgia, where city solicited services of Georgia law firm to assist in defense of Oklahoma class-action lawsuit; noting that, "[a]lthough the trial was to occur in Oklahoma, the parties contemplated that significant amounts of work would be performed in Georgia prior to any trial," and that "[d]uring the course of the relationship, the City consistently contacted the Georgia attorneys with phone calls, e-mails, and letters"); Stayart v. Hance, 305 Wis.2d 380, 740 N.W.2d 168, 174 ¶ 21 (App. 2007) (Tennessee resident contacted Wisconsin-based attorney by telephone, to retain Wisconsin attorney to assist in wrongful-discharge action to be filed in Tennessee; personal jurisdiction proper because "Hance purposefully availed himself of the privilege of doing business in Wisconsin by initiating and agreeing in writing to a business relationship with Stayant, a Wisconsin resident, resulting in Stayant performing numerous legal services in Wisconsin on Hance's behalf").

9. Mason's Brief acknowledges that she solicited and entered into an agreement calling for the performance of substantial professional services in Missouri. Her Brief states: "Mason agreed that Strohbehn would be the law-

solicit his acceptance of her offer. The trial court found that Mason was in frequent contact with Walters Bender, in Missouri, as they prepared for trial, supplied information and material to Walters Bender for their use in trial preparation, and offered to come to Missouri to participate in the joint trial preparation effort. The court also found that, as contemplated, Walters Bender performed "the overwhelming majority" of its services in Kansas City, both before and during trial. The trial court concluded that the present cause of action was "directly related" to Mason's Missouri contacts, since she had refused to pay Walters Bender for the largely Missouri-based services she had solicited.

In short, Mason intentionally solicited, and then secured, the agreement of a Missouri resident to perform substantial and costly services in Missouri, and agreed to pay for those services. She provided information and materials to the Missouri resident to facilitate its performance of those services, and maintained constant contact with the Missouri resident as it performed its work. She then reneged on her agreement to pay for the services she had commissioned. In these circumstances, Mason could reasonably anticipate that she might be sued in Missouri for breach of the agreement. Mason had sufficient minimum contacts with Missouri to support the circuit court's exercise of personal jurisdiction over her.

Mason's briefing emphasizes that she was never physically present in Missouri, and she cites a number of cases which state that telephone and mail communications with a forum resident cannot by themselves support personal jurisdiction.

The Missouri Supreme Court rejected a similar argument in *Bryant*, however. While it recognized that "mailings alone often may not provide a sufficient basis for personal jurisdiction," it emphasized that

the minimum contacts analysis "is not susceptible of mechanical application." It is an ad hoc process; rather than arriving at per se conclusions, the facts of each case must be examined carefully. Where sufficiently significant to a particular cause of action, the mailing of documents into a state has been held adequate to provide the minimum contacts necessary for a court to exercise personal jurisdiction.

310 S.W.3d at 235 n. 6 (citation omitted). Moreover, the United States Supreme Court has emphasized that, in the modern American economy, an out-of-state defendant may often conduct business in a State the defendant never physically enters:

Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Burger King*, 471 U.S. at 476, 105 S.Ct. 2174. The fact that Mason's contacts with Missouri were by phone, facsimile trans-

yer who would prepare the damage *case from Kansas City,* do all things necessary to create the damage case, including locating the witnesses, working with them, assembling the damages packages, sending it to them, and

. working with them on their opinions and when the trial came, he would do additional things, including opening statement and direct examination of experts." Appellant's Br. at 19 (emphasis added).

mission, and e-mail does not prevent Missouri's courts from exercising jurisdiction over her; it is *the nature* of her communications with Walters Bender, not *the medium* through which those communications occurred, which is decisive.

The fact that a defendant has sufficient "minimum contacts" with a forum State is not enough to satisfy the Due Process Clause; in addition, "exercise of personal jurisdiction over a defendant with minimum contacts must be 'reasonable' in light of the surrounding circumstances of the case." *Peoples Bank*, 318 S.W.3d at 129 (quoting *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). Mason does not argue that the exercise of jurisdiction over her would be unreasonable, if minimum contacts exist; we therefore need not separately conduct a reasonableness inquiry.

### Conclusion

The circuit court's judgment is affirmed.

All concur.